EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| TEC General Contractors, Corp.<br><br>Peticionario<br><br>v.<br><br>Autoridad de Energía Eléctrica; CSA Architects & Engineers<br><br>Recurridos | Certiorari<br><br>2022 TSPR 124<br><br>210 DPR ____ |

Número del Caso: CC-2021-213

Fecha: 13 de octubre de 2022

Tribunal de Apelaciones:

    Región Judicial San Juan-Caguas

Abogada de la parte peticionaria:

    Lcda. Rebecca Barnés Rosich

Abogados de la parte recurrida:

    Lcdo. Juan J. Velilla Janeiro
    Lcda. Victoria D. Pierce King
    Lcdo. Charles Bimbela Quiñones

Materia: Sentencia con Opinión de Conformidad.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| TEC General Contractors, Corp.<br><br>Peticionario<br><br>v.<br><br>Autoridad de Energía Eléctrica;<br>CSA Architects & Engineers<br><br>Recurridos | CC-2021-0213 | *Certiorari* |
|---|---|---|

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de octubre de 2022.

Examinada la *Petición de Certiorari* presentada por TEC General Contractors, Corp., se revoca la *Sentencia* dictada por el Tribunal de Apelaciones y se reinstala la *Sentencia* emitida por el Tribunal de Primera Instancia.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García emitió una Opinión de Conformidad a la cual se unen los Jueces Asociados señores Martínez Torres y Kolthoff Caraballo. La Jueza Asociada señora Pabón Charneco está conforme y emite la siguiente expresión de conformidad a la cual se une el Juez Asociado señor Estrella Martínez:

> Estoy conforme con el resultado anunciado en la Sentencia que antecede por entender que las conclusiones de derecho del Tribunal de Apelaciones fueron incorrectas. Específicamente, la determinación del foro intermedio de que el incumplimiento de Tec General Contractors, Corp. con el Art. 34 del Contrato entre las partes, equivalía a una renuncia a los posibles reclamos que pudiera tener contra la AEE. Esto, a pesar de que del Contrato entre las partes no surge ni se pactó tal efecto. No obstante, debemos recordar que los foros apelativos pueden interferir con la apreciación de la prueba documental por parte de los foros de instancia en ausencia de un argumento levantado por alguna de las partes. Nótese que, al encontrarnos ante prueba documental, los tribunales apelativos se

encuentran en la misma posición que el foro recurrido para evaluarla.

Es cierto que la norma que permea en nuestro sistema de justicia es la discreción judicial ante la evaluación de la evidencia presentada en un caso y controversia. *González Hernández v. González Hernández,* 181 DPR 746, 777 (2011). Esto es así porque los jueces de instancia son quienes se encuentran en mejor posición para aquilatar la prueba. No obstante, los tribunales apelativos tienen la prerrogativa y discreción de evaluar la prueba pericial o documental y adoptar su propio criterio respecto a la apreciación. Íd. Incluso, los foros revisores tienen la facultad de descartar la prueba pericial o documental aun cuando resulte técnicamente correcta. Además, aunque los peticionarios no argumenten un error de derecho ante el foro apelativo intermedio, este Tribunal ha expresado en el pasado que se permite la intervención cuando provee un remedio completo. *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 216 (2021); *López Vicil v. ITT Intermedio, Inc.,* 143 DPR 574 (1990).

Por lo tanto, entiendo que el foro intermedio no se extralimitó en el ejercicio de sus funciones revisoras ni erró al interferir con la apreciación de la prueba por parte del foro primario. *A contrario sensu*, el Tribunal de Apelaciones ejerció correctamente su facultad de considerar los términos contractuales del caso de autos. Sin embargo, erró en su apreciación de la prueba documental. A la luz de estas circunstancias, me parece errado catalogar un análisis incorrecto como una extralimitación de las facultades de un foro revisor".

El Juez Asociado señor Estrella Martínez está conforme y emite la siguiente expresión de conformidad:

La sentencia que hoy emite este Tribunal rectifica el curso de acción acertado que dictó el Tribunal de Primera Instancia. Por ende, extiendo mi conformidad a la revocación de la determinación del Tribunal de Apelaciones y el restablecimiento en su

totalidad del dictamen que emitió el foro primario.

En este caso, la determinación del foro apelativo intermedio era patentemente errónea. Mas, la raíz de tal error halló agarre en un defecto en el ejercicio de su apreciación de la prueba, no en el acto en sí de asumir tal función. Entiéndase, el fallo en la conclusión a la que arribó el Tribunal de Apelaciones se fundamentó en su decisión de descartar la apreciación del Tribunal de Primera Instancia a favor de su interpretación, la cual se fundamentó en un solo documento completamente descontextualizado del resto de la prueba. En fin, el Tribunal de Apelaciones se equivocó al formular un posible incumplimiento de contrato y determinar que ello causó que la parte perdiera su reclamo cuando tal conclusión estaba en abierto conflicto con el resto de la prueba y las determinaciones abarcadoras que efectuó el foro de instancia.

Por consiguiente, considero que el Tribunal de Apelaciones debía ser revocado, no por rebasar los límites de su encomienda al ejercer su juicio adjudicativo sobre la totalidad de la controversia más allá de los errores planteados por las partes, sino por meramente efectuar un error en tal función. Ciertamente, evaluar la prueba documental es y siempre ha sido parte de las funciones de tal foro. Afirmar lo contrario sería adoptar una visión severamente limitante de la libertad del foro apelativo intermedio para resolver las controversias ante su consideración.

Si bien los señalamientos de error que identifican una parte aclaran los ángulos argumentativos y optimizan la evaluación de los casos, estos no pueden constituir el principio y el fin de la consideración y análisis que debe efectuar un tribunal. En la búsqueda de la justicia, los jueces y las juezas no pueden depender únicamente de que las partes les provean un mapa con un rumbo rígido del cual no puedan desviarse. Por el contrario, su rol es conocer el derecho y aplicarlo por encima de las destrezas analíticas y argumentativas de

los litigantes al momento de adjudicar una controversia. Solo así se estará en posición de conceder el remedio completo que exige nuestro ordenamiento."

El Juez Asociado señor Colón Pérez disiente sin opinión escrita. La Jueza Presidenta Oronoz Rodríguez no intervino. El Juez Asociado señor Feliberti Cintrón está inhibido.


                          Javier O. Sepúlveda Rodríguez
                          Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| TEC General Contractors, Corp.<br><br>Peticionario<br><br>v.<br><br>Autoridad de Energía Eléctrica;<br>CSA Architects & Engineers<br><br>Recurridos | CC-2021-0213 | *Certiorari* |

**Opinión de Conformidad emitida por el Juez Asociado señor Rivera García a la cual se unen los Jueces Asociados señores Martínez Torres y Kolthoff Caraballo.**

En San Juan, Puerto Rico, a 13 de octubre de 2022.

Indudablemente, el proceder del Tribunal de Apelaciones en este caso no fue correcto. En su actuación, el foro intermedio soslayó una de las cimientes más preciadas de nuestro ordenamiento legal y del debido proceso de ley, **el principio de la adversidad.** Bajo dicho precepto, **corresponde a las partes, no a los tribunales, escoger los fundamentos jurídicos con los cuales pretenden prevalecer en su causa.**

En ese sentido, **ausentes circunstancias excepcionales**, un tribunal no debe adjudicar un caso en base a un fundamento legal **que no le fue planteado.** Más aun, tal comportamiento se torna especialmente inapropiado cuando el caso se encuentra ante un **foro apelativo**, el cual **no tuvo la oportunidad de auscultar la prueba desfilada.** En aras de exponer en más detalle mi posición, expongo los hechos de este caso.

I

El pleito de autos tiene su génesis en el proyecto de Rehabilitación del Canal Derivación Guajataca (el Proyecto), para el cual la Autoridad de Energía Eléctrica (AEE) contrató a CSA Architects & Engineers (CSA) para el diseño de la obra.[1] El acuerdo entre estas partes contemplaba los servicios profesionales necesarios y convenientes en la fase de ingeniería, arquitectura y agrimensura, incluyendo los estudios y diseños de ingeniería y arquitectura. Además, del contrato surge que la AEE y CSA pactaron que sus responsabilidades por los daños y perjuicios resultantes del contrato serían conforme a lo establecido en el Código Civil de Puerto Rico y su jurisprudencia interpretativa.

Posteriormente, la AEE publicó un anuncio de subasta para la ejecución del proyecto y entregó a los licitadores interesados los planos y especificaciones, preparados por CSA, para que sometieran sus propuestas. Luego de concluir que TEC General Contractors, Corp. (TEC o peticionaria) era un contratista responsivo y responsable, capaz de

---

[1] Adviértase, que aquí no existe controversia sustancial en cuanto a los hechos que originaron este pleito. Por un lado, la postura reiterada de la peticionaria es que las determinaciones fácticas del foro primario fueron correctas. A su vez, la AEE y CSA argumentan que el dictamen del foro intermedio se fundó en la consideración de un presunto error de derecho, sin interferir con las determinaciones de hechos del foro primario. Véanse, *Alegato de la Parte Recurrida CSA Architects & Engineers*, pág. 20; *Alegato de la Recurrida Autoridad de Energía Eléctrica*, pág. 8.

Siendo así, previo a exponer el tracto procesal de este recurso, presentamos una relación de los hechos pertinentes, según estos fueron determinados por el foro de instancia. Véase Apéndice del *Certiorari*, *Sentencia* del Tribunal de Primera Instancia del 5 de noviembre de 2015, págs. 32-50.

ejecutar la obra conforme a los planos y especificaciones, la AEE le adjudicó la obra. Así, el 12 de noviembre de 2003, TEC y la AEE otorgaron un contrato de construcción para llevar a cabo la ejecución del Proyecto por la cantidad de $9,292,343.00 y un tiempo de ejecución de setecientos treinta (730) días.

Según surge de los autos, TEC no intervino en el diseño y preparación de los planos y especificaciones del Proyecto. Además, al comienzo de la ejecución de la obra, la AEE contrató los servicios de CSA para que proveyera la supervisión durante la construcción. Esto incluía la evaluación y determinación sobre remisiones (también conocidos como *submittals*) del contratista, aclaraciones e interpretaciones relacionadas al diseño, supervisión general de los trabajos, evaluación de cambios y servicio de apoyo en la fase de construcción.

Así las cosas, la AEE emitió una orden de comienzo de la obra —efectiva el 30 de diciembre de 2003— y pautó la fecha de terminación para el 30 de diciembre de 2005. Destacamos, que el contrato suscrito entre TEC y la AEE establecía que el cumplimiento oportuno del Proyecto era imprescindible, razón por la cual el contrato fijaba los daños líquidos a razón de $7,000.00 diarios por cada día de atraso provocado por el contratista.

Por otra parte, el plan de ejecución del Proyecto establecía que la obra se ejecutaría en dos (2) fases

secuenciales. La primera fase —designada en los documentos contractuales como Fase III— consistiría en la construcción de una estación de bombas con el fin de permitir el cierre del canal y desviar el agua a través de la estación de bombas, para no interrumpir el servicio de agua a los consumidores mientras se reconstruía el canal. Esta fase tenia un término de doce (12) meses para su ejecución. Entretanto, se debería ejecutar la segunda fase —designada como Fase I en los documentos—la cual implicaba la demolición de tres (3) kilómetros del canal y su reconstrucción total. Además, trabajos de reparación en otras áreas del canal que no se demolerían y la construcción de un camino de acceso y varias atarjeas.

Iniciado el Proyecto, este sufrió una demora producto de una falta de cierto permiso del Departamento de Recursos Naturales, el cual debía obtener la AEE. Como consecuencia de este atraso, la AEE reconoció una extensión de tiempo equivalente a cuarenta y un (41) días calendario, lo cual implicó que la fecha de terminación de la obra se revisara para el 10 de febrero de 2006. Eventualmente, la Fase III concluyó el 4 de noviembre de 2004, por lo cual la estación de bombas entró en funciones.

En lo pertinente a la reconstrucción del canal, surge que las paredes del este fueron diseñadas a un ángulo de cuarenta y cinco (45) grados. De esta manera, la

reconstrucción del canal contemplaba la demolición del canal existente y la colocación de un material de relleno granular sobre el terreno natural. Sobre ese material se colocaba un geotextil para separar los materiales entre las capas. Luego del geotextil, en la parte inferior del canal, se colocaba un tubo de cuatro (4) pulgadas, rodeado de material de drenado en la trinchera. En las paredes laterales, el material a colocarse debía ser uno bien gradado. Después del depósito del material de las paredes laterales, se preparaba el área y se depositaba el hormigón del canal.

Según surgía de la hoja DT-1 de los planos preparados por CSA, el material especificado para ser colocado como base en las paredes laterales del canal se definió como sigue:

> WELL GRADED AGGREGATE MAXIMUM SIZE 3/4" (PERMEABLE GRANULAR BACKFILL FILTER MATERIAL CONSISTING OF HARD, DURABLE, CLEAN SAND, GRAVEL OR CRUSHED STONE FREE OF ORGANIC MATERIAL, CLAY OR DIRT).[2]

A su vez, el término *well graded* fue definido en el Artículo 1.2(H) de la sección 02220 de las especificaciones técnicas del Proyecto, preparadas por CSA, como sigue:

> H. Well-Graded
>
> > 1. A mixture of particle sized with no specific concentration or lack thereof of one or more sized.
> >
> > 2. Does not define numerical value that must be placed on coefficient of uniformity,

---

[2] Apéndice del *Certiorari*, *Sentencia* del Tribunal de Primera Instancia del 5 de noviembre de 2015, pág. 37.

coefficient of curvature, or other specific grain size distribution parameters.

3. Used to define material type that, when compacted, produces a strong and relatively incompressible soil mass free from detrimental voids.[3]

En atención a lo anterior, TEC consideró y estimó colocar un material bien gradado (*well graded*), libre de vanos detrimentales y de material orgánico, sucio y arcilla, compactado, para que se mantuviera en sitio y, sobre dicho material, colocar el hormigón. Por otro lado, según surge del contrato entre TEC y la AEE, este primero venía obligado a presentar una remisión (*submittal*) al dueño de la obra para la aprobación de los materiales a ser utilizados.

Como parte de la dinámica del Proyecto, CSA evaluaba las remisiones de TEC en virtud de sus responsabilidades de supervisión de la obra, en representación de la AEE. Es decir, sin la aprobación del dueño, por conducto del diseñador, TEC no podía ejecutar el trabajo. Así pues, si lo incluido en una remisión cumplía con el contrato, el diseñador tenía que aceptarlo. Si no cumplía, entonces se podía condicionar o rechazar.

Entretanto, mientras se construía la estación de bombas, TEC comenzó la planificación de la reconstrucción del canal. Durante este proceso, la AEE le indicó a TEC que necesitaban que el material de base del canal tuviera una alta capacidad de drenaje. Así, los funcionarios de la

---

[3] Íd.

AEE instruyeron a TEC que utilizara piedra uniforme para colocar como base del canal, para que drenara a mayor capacidad. Aunque este no era el material considerado y estimado por TEC, en ánimo de acomodar la solicitud del dueño, la peticionaria decidió probar el material uniforme para corroborar si funcionaba. A esos fines, el 23 de julio de 2004, TEC presentó la Remisión 32 con la piedra uniforme solicitada por la AEE. Esta remisión fue aprobada por CSA el 4 de agosto de 2004.

Posteriormente, mientras se construía la estación de bombas, TEC efectuó una prueba con la piedra uniforme, fuera del área del canal, para evaluar su comportamiento. De este modo, el resultado de la prueba fue que la piedra uniforme no se sostenía en la pendiente de cuarenta y cinco (45) grados de las paredes laterales del canal. Esto se le informó de inmediato a la AEE. No obstante, los funcionarios de la AEE le reiteraron a TEC que interesaban que se colocara un material de alta capacidad de drenado bajo el canal. A raíz de ello, las partes se adentraron en una búsqueda de alternativas a lo diseñado, con el fin de satisfacer el requisito de alto drenado.

Es meritorio apuntalar, que, según fue determinado, CSA no especificó una capacidad de drenaje particular para el material a colocarse en las paredes. Por el contrario, la única mención de drenaje, indicada por CSA en el plano, era que el material drenara, para lo cual se señaló que

debía ser un material bien gradado. Así pues, TEC comenzó a efectuar pruebas con distintas combinaciones de materiales con el fin de lograr una mayor capacidad de drenaje que la que producía el material bien gradado que había sido especificado.

Ahora bien, el 24 de febrero de 2005, la AEE emitió una orden de paralización de los trabajos en las paredes laterales del canal, mientras se reunía con CSA para que estos últimos le dieran alternativas para resolver el problema. Consecuentemente, la AEE le instruyó a TEC que tan pronto tuvieran las alternativas se reunirían para discutir las mismas y proseguir con los trabajos según programados. En atención a ello, TEC detuvo la actividad de colocación de la base del canal hasta en tanto recibiera instrucciones de parte de la AEE.

Luego, para el 1 de marzo de 2005, la AEE le entregó a TEC un correo electrónico, preparado por el personal de CSA, el cual establecía una granulometría para el material en los laterales del canal. En particular, la granulometría indicada contenía una limitación de que no más del ocho por ciento (8%) del material podría pasar por el tamiz 200.

Así las cosas, el 3 de marzo de 2005, TEC presentó la Remisión 79, la cual, según determinó el foro primario, cumplía con lo especificado en el contrato. El material que surgía de la Remisión 79 era uno bien gradado y en

cumplimiento con lo especificado en la hoja DT-1 de los planos. Posterior a ello, TEC probó el material propuesto en la Remisión 79 y este se mantuvo estable en la pendiente de cuarenta y cinco (45) grados al ser compactado, funcional y sin necesidad de mecanismos externos de confinamiento. No obstante, CSA no aprobó el material sometido. Específicamente, CSA condicionó la aprobación de la Remisión 79 a que el material no excediera del ocho por ciento (8%) al pasar por el tamiz 200.

En desacuerdo, el 30 de marzo de 2005, TEC le cursó una comunicación a la AEE en la cual indicó que el contrato requería un material bien gradado sin una granulometría específica. Así, arguyeron que el material que surge del contrato no tiene la limitación establecida por CSA. No obstante, el 2 de mayo de 2005, la AEE le comunicó a TEC que la piedra uniforme de tres cuartas (3/4) de una pulgada, incluida en la Remisión 32, era la adecuada. Por su parte, TEC le replicó a la AEE e indicó que no asistiría a las reuniones del Proyecto hasta en tanto se celebrara una reunión técnica. Insistió en que el asunto más importante para la obra era resolver la diferencia en cuanto al material en las paredes laterales.

Así pues, el 5 de mayo de 2005, la AEE le contestó a TEC y expuso que esta última debía resolver sus dificultades con el método de construcción, so pena de ser

declarada en incumplimiento. TEC reiteró su pedido de una reunión técnica, pero, el 2 de junio de 2005, la AEE emitió una instrucción dirigida a TEC en la cual consignó que esta

> Deberá agotar todas las alternativas, inclusive, la de restringir físicamente la piedra para realizar el proyecto. Es su responsabilidad completar la obra, según diseñada y aceptada al firmar el contrato. El contratista procederá inmediatamente a realizar las tareas, de acuerdo con lo especificado, y cualquier desacuerdo, se apelará al Director Ejecutivo, según establece el Artículo 34 del contrato.[4]

Según determinó el Tribunal de Primera Instancia, "[l]a comunicación del 2 de junio de 2005 constituyó una instrucción directa a TEC de que instalara la piedra uniforme de 3/4" confinada. Si no estaba de acuerdo, la AEE apercibió a TEC de que podía representar su reclamación."[5] Más tarde, en una reunión celebrada el 3 de junio de 2005, TEC sostuvo que la instalación de la piedra uniforme de 3/4" constituyó un cambio a las especificaciones. La AEE le instruyó que procediera según sus instrucciones e instalara la piedra confinada. Además, le recordó que podía presentar una reclamación bajo el Artículo 34 del contrato, si entendía que procedía.

No obstante, el 17 de junio de 2005, TEC le envío una comunicación a la AEE en la cual notificó que reiniciarían las actividades de hormigón en el canal el 21 de junio de 2005 y que utilizarían como mecanismo de restricción la piedra uniforme requerida. Asimismo, TEC reiteró que la

---

[4] Íd., pág. 47.
[5] Íd.

actividad de hormigón en el canal había sido detenida desde el 24 de febrero de 2005 por la AEE. Además, expuso que "[e]l tiempo que la actividad fue detenida y los costos envueltos a esta situación serán reclamados a la AEE. Adicionalmente estaremos cuantificando el efecto en términos económicos y en tiempo de restringir la piedra para reclamar por los mismos a la AEE".[6]

Posteriormente, el 7 de octubre de 2005, la AEE contestó la comunicación de TEC y rechazó cualquier reclamación por tiempo y costos adicionales que resultara de la controversia en torno a la construcción del canal. Consecuentemente, el 7 de noviembre de 2005 TEC presentó una apelación ante el Director Ejecutivo de la AEE.

Según surge, en los meses posteriores, la AEE aprobó extensiones de tiempo que modificaron la fecha de terminación del Proyecto para el 10 de marzo de 2006. Además, el 3 de marzo de 2006, la AEE aceptó la terminación sustancial de la obra. Finalmente, la aceptación final se dio el 4 de diciembre de 2006.

Así entonces retornamos al trasfondo procesal que origina este pleito. El 1 de julio de 2010 TEC instó la *Demanda* de epígrafe contra la AEE. Reclamó una indemnización inicial de $2,035,979.10.[7] Oportunamente, la

---

[6] Íd., pág. 48.

[7] Mediante una *Demanda Enmendada* presentada el 2 de noviembre de 2012, TEC redujo la partida de daños reclamados a $1,215,439.00. Véase, *Apéndice del Certiorari, Recurso de Apelación presentado por la parte demandada, Autoridad de Energía Eléctrica el 28 de marzo de 2016 ante el Tribunal de Apelaciones*, pág. 146.

AEE contestó la reclamación y negó responsabilidad.[8] Además, el 18 de julio de 2011, la AEE interpuso una *Demanda Contra Tercero* en contra de CSA. En síntesis, la AEE adujo que CSA fue la responsable de la obra y que fue quien brindó el asesoramiento técnico, por lo cual todo asunto relacionado con el diseño y los materiales para la construcción quedó bajo el control de CSA.[9] Solicitó que se le impusiera responsabilidad a CSA por cualquier cantidad que la AEE tuviera que pagar a TEC. Por su parte, CSA presentó una *Contestación a Demanda Contra Tercero* en la cual alegó afirmativamente que los daños alegados por TEC se debían a una implementación errónea de los métodos de construcción.[10]

Tras varios trámites, el foro primario celebró el juicio en su fondo los días 15, 17, 18, 22 y 24 de septiembre de 2014; 1, 3, 4 y 18 de diciembre de 2014; 13, 14, 15, 16, 22 y 29 de enero de 2015 y 6 de febrero de 2015. Luego de examinar la prueba pericial, testifical y documental ante su consideración, el Tribunal de Primera Instancia dictó *Sentencia* el 5 de noviembre de 2015, en la cual declaró con lugar la *Demanda* instada por TEC. Coetáneamente, **formuló noventa y seis (96) determinaciones de hechos** las cuales, recabamos, fueron recogidas en la alocución fáctica que precede.

---

[8] Íd., pág. 140.
[9] Íd., pág. 153.
[10] Íd., pág. 157.

De entrada, el foro primario razonó que, dado el contrato entre la AEE y CSA, la responsabilidad por cualquier error u omisión en el diseño debía recaer exclusivamente en CSA. Por tanto TEC, venía obligada a ejecutar el trabajo según surge de los planos y especificaciones. Ahora bien, TEC, en su capacidad de contratista, debía determinar los métodos de construcción con los cuales ejecutaría el trabajo y los materiales especificados. Es decir, según entendió el foro de origen, el método de construcción es la manera en la cual el contratista ejecuta el trabajo especificado en el contrato, al igual que cómo instala y coloca los materiales y equipos especificados en el contrato.

En atención a lo anterior, el tribunal primario afirmó que era insostenible que el contratista planificara métodos de construcción al utilizar materiales diferentes a los especificados. A su vez, expuso que, si la necesidad o conveniencia del cambio o modificación obedece a un error u omisión del diseñador de la obra, entonces sería el diseñador quien vendría obligado a responderle al dueño por error u omisión. De esta manera, el foro primario concluyó que CSA actuó negligentemente en este caso, pues su asesoría a la AEE fue la que provocó los daños sufridos por TEC.

Según estimó el foro de origen, el contrato entre la AEE y TEC establecía el derecho de la AEE para efectuar

cambios al trabajo contratado. No obstante, de ocurrir un cambio solicitado por la AEE, el cual resultara en un costo o tiempo adicional, las partes deberían negociar la revisión mediante una orden de cambio. Razonó el Tribunal de Primera Instancia, que, de existir una discrepancia donde el dueño de la obra sostiene que no ha ocurrido un cambio y el contratista entiende que sí, entonces el contratista debe completar el trabajo y luego presentar su reclamación. De esta manera, se viabiliza la culminación de la obra, sin menoscabar los derechos de las partes.

En fin, el foro primario concluyó que la decisión de CSA, de no aceptar la Remisión 79 e imponer restricciones adicionales a las que surgen del contrato, constituyó un cambio implícito al contrato entre la AEE y TEC. Toda vez que CSA no atemperó la intención del diseño con lo que fue diseñado, al igual que no cumplió con su deber de proveer consultoría correcta y adecuada, provocó que la AEE ordenara un cambio implícito en el trabajo, sin reconocer la orden de cambio, lo cual provocó costos adicionales a TEC.

A la luz de lo antes expuesto, el foro primario ordenó a la AEE a responder exclusivamente por los daños atribuidos al balance del retenido y al atraso de cuarenta y un (41) días, como consecuencia de la falta de permisos. En total, estos ascienden a $173,847.00. Por otra parte, determinó que la AEE y CSA debían responder solidariamente

por las partidas de daños sufridas por TEC como resultado del cambio implícito en la obra. Estas ascienden a $1,273,619.00. Además, CSA vendría obligada a resarcirle a la AEE cualquier partida que esta tuviera que pagar por este concepto.

Tras emitirse el dictamen del foro primario, la AEE instó una *Moción de Reconsideración de Sentencia*.[11] Esencialmente, impugnó la partida concedida a TEC por concepto del retenido y sostuvo reiteradamente que, en cuanto a las demás partidas de daños, estas eran atribuibles a la propia responsabilidad de TEC. Por su parte, CSA interpuso una *Solicitud de Determinaciones Adicionales, de Enmienda a las Determinaciones de Hechos y de Reconsideración*.[12] En síntesis, propuso ciertas enmiendas a las determinaciones de hechos en aras de alinearlas con la prueba desfilada. A su vez, presentó una propuesta de hechos adicionales que argumentaron debían ser añadidos a la *Sentencia.* Luego de que TEC presentara su oposición a ambas mociones, el foro primario declinó acogerlas.

Así, inconforme con el dictamen del foro primario, la AEE recurrió ante el Tribunal de Apelaciones mediante un recurso de *Apelación*.[13] A través de su escrito, la AEE

---

[11] Íd., págs. 234-252.
[12] Íd., págs. 253-325.
[13] Por su extensión, reproducimos en esta nota al calce los señalamientos de error levantados por la AEE ante el foro intermedio. Estos fueron los siguientes:

reiteró sus argumentos en contra de la procedencia de la partida por concepto de retenido y sobre las demás partidas de daños concedidas. En su conclusión, solicitó al foro intermedio que revocase al foro primario bajo la premisa de que los daños, sin incluir el retenido, no fueron producto de la metodología empleada en la construcción del Proyecto.[14] Además, afirmó que, de

---

A. Erró el Tribunal de Primera Instancia al determinar en sus Conclusiones de Derecho que la AEE responde por la partida relacionada al retenido del proyecto cuando en ninguna de las noventa y seis (96) Determinaciones de Hecho se hace alusión a la falta de pago de la AEE por ese concepto.

B. Erró el Tribunal de Primera Instancia al determinar que la AEE responde por los alegados costos adicionales incurridos por ineficiencia para el periodo que comprende desde el 4 de noviembre de 2004 hasta el 21 de julio de 2005 del proyecto en Guajataca.

C. Erró el Tribunal de Primera Instancia al determinar que la AEE responde por los alegados costos incurridos para acelerar los trabajos de reconstrucción del canal del proyecto en Guajataca.

D. Erró el Tribunal de Primera Instancia al determinar que la AEE responde por la alegada pérdida de productividad ocasionada por la aceleración y las horas extra trabajadas resultantes de la colocación del material en las paredes laterales del canal del proyecto en Guajataca.

E. Erró el Tribunal de Primera Instancia al determinar que la AEE responde por los alegados costos adicionales relacionados a la utilización de un método de construcción especializado para mantener en sitio el material agregado en las paredes laterales del Canal del proyecto en Guajataca.

F. Erró el Tribunal de Primera Instancia al determinar que la AEE responde por los alegados costos adicionales incurridos en la operación de las bombas de agua del proyecto en Guajataca.

G. Erró el Tribunal de Primera Instancia al determinar que la AEE responde por el alegado costo extendido de oficina de campo del proyecto en Guajataca.

H. Erró el Tribunal de Primera Instancia al determinar que la AEE responde por el alegado costo extendido de oficina central del proyecto en Guajataca.

I. Erró el Tribunal de Primera Instancia al determinar que la AEE y la tercera demandada CSA, responden solidariamente por los alegados costos adicionales incurridos y por todos los daños alegadamente sufridos por TEC, resultantes de la colocación del material en las paredes laterales del canal del proyecto en Guajataca. Íd., págs. 112-13.

[14] Íd., pág. 133

entender que los daños obedecieron al diseño y presunto cambio implícito de material, CSA debería responderle directamente a TEC, por ser responsable del diseño del Proyecto.[15]

Por su parte, CSA igualmente recurrió del dictamen del foro primario mediante un recurso de *Apelación*.[16] Según surge de su escrito, CSA argumentó que el foro primario erró al validar el presunto cambio implícito en el contrato entre TEC y la AEE, lo cual sostuvo era una violación a la normativa respecto a la contratación gubernamental.[17] Además, arguyó que el foro de origen erró en su apreciación de la prueba, al determinar que en

---

[15] Íd.

[16] Similarmente, recogemos en esta nota al calce los errores planteados por CSA ante el foro intermedio. Fueron los siguientes:

A. Erró crasa y manifiestamente el TPI al aplicar el derecho y determinar que se configuró un cambio implícito del contrato gubernamental entre AEE y TEC, resolviendo contrario al derecho aplicable en nuestra jurisdicción.

B. Erró crasa y manifiestamente el TPI al apreciar la prueba pericial realizando determinaciones de hechos y conclusiones de derecho en torno a esta, e imponiendo costos adicionales a favor de TEC como resultado del supuesto cambio implícito al contrato entre la ABE y TEC.

C. De este Honorable Tribunal determinar que sí hubo un cambio implícito al contrato entre TEC y ABE, erró el TPI al no determinar que el contratista, TEC, no mitigó los daños alegados.

D. Erró el TPI al no imponer responsabilidad a AEE por sus actuaciones y las de su agente, el inspector; y al determinar que existe una relación de solidaridad entre la AEE y CSA, interpretando erróneamente el derecho aplicable a los hechos; en la alternativa que este Ilustre Foro entienda que existe dicha solidaridad, erró el TPI al no imponer por cientos de Responsabilidad.

E. Erró el TPI al imponer intereses pre-sentencia/por morosidad, desde la radicación de la Demanda, a partidas que al momento de la presentación de la acción civil no estaban cuantificadas, en otras palabras, no eran cantidades líquidas y exigibles. Apéndice del Certiorari, Recurso de Apelación presentado por la parte apelante, CSA Architects & Engineers el 28 de marzo de 2016 ante el Tribunal de Apelaciones, págs. 330-60.

[17] Íd., pág. 337.

efecto hubo un cambio implícito en la obra.[18] También, sostuvo que el foro primario erró al no concluir que TEC falló en mitigar los daños sufridos. Particularmente, destacó que TEC pudo haber presentado su reclamación tan temprano como agosto de 2004, o, a partir de febrero de 2005, cuando se le ordenó que detuviese la colocación de grava en los laterales del canal hasta que se obtuvieran otras alternativas.[19] Según CSA, TEC debió elegir un método para fijar el material aprobado y, en consecuencia, reclamar a la AEE.[20]

Coetáneo con la presentación de su recurso ante el foro intermedio, la AEE instó una *Moción Solicitando se le Ordene al Tribunal de Primera Instancia la Elevación del Expediente Original del Caso de Epígrafe al Tribunal de Apelaciones*. En concreto, expuso que en este caso la prueba presentada por las partes en el juicio en su fondo resultaba necesaria y útil para que el foro intermedio pudiese resolver la controversia.[21] Así, solicitó que se ordenara la elevación del expediente original del caso al Tribunal de Apelaciones.[22]

A su vez, CSA interpuso una *Moción Complementaria En Torno a la Presentación de Transcripción de Vistas Evidenciarias*. En su escrito, CSA aludió a la complejidad

---

[18] Íd.
[19] Íd., pág. 343.
[20] Íd.
[21] Apéndice del Certiorari, *Moción Solicitando se le Ordene al Tribunal de Primera Instancia la Elevación del Expediente Original del Caso de Epígrafe al Tribunal de Apelaciones*, pág. 370.
[22] Íd.

y los temas técnicos que entrañan el caso de epígrafe. De este modo, consideró que los errores relacionados a la prueba testifical solo podían ser examinados y dirimidos por el Tribunal de Apelaciones con el beneficio de una transcripción de algunas de las vistas en su fondo.[23]

Así las cosas, el panel del Tribunal de Apelaciones que atendió la moción presentada por la AEE dispuso, que, en esa etapa de los procedimientos, se declaraba sin lugar la solicitud de elevación de los autos originales.[24] Por otra parte, un panel distinto declaró con lugar la moción instada por CSA, autorizándose la presentación de una transcripción de las vistas evidenciarias que fueron aludidas en el escrito.[25] Resaltamos, que el panel que atendió la moción de CSA similarmente dispuso que oportunamente determinaría si era necesaria la elevación de los autos originales.[26]

Tras una solicitud de TEC, el foro intermedio ordenó la consolidación de los recursos apelativos.[27] Posteriormente, CSA presentó la transcripción estipulada del juicio en su fondo.[28] A partir de esa instancia procesal, las partes del pleito tuvieron la oportunidad de

---

[23] Apéndice del *Certiorari*, *Moción Complementaria En Torno a la Presentación de Transcripción de Vistas Evidenciarias*, pág. 372.

[24] Apéndice del *Certiorari*, *Resolución* del 6 de abril de 2016, pág. 378.

[25] Apéndice del *Certiorari*, *Resolución* del 11 de abril de 2016, pág. 382.

[26] Íd., pág. 383.

[27] Apéndice del *Certiorari*, *Resolución* del 19 de mayo de 2016, págs. 407-08.

[28] Apéndice del *Certiorari*, *Moción para Presentar Transcripción Estipulada del Juicio e Informar la Presentación de Alegato Suplementario*, págs. 409-410.

presentar sus alegatos suplementarios, con sus respectivas réplicas y dúplicas.

En los años subsiguientes, el caso fue archivado temporeramente, producto una *Sentencia* de archivo administrativo, al amparo de la Ley PROMESA.[29] No obstante, para el año 2020, TEC instó una *Solicitud de Apertura y Continuación de Procedimientos* ante el foro intermedio.[30]

Así las cosas, el Tribunal de Apelaciones procedió a la adjudicación del recurso en sus méritos. Mediante una *Sentencia* dictada el 26 de enero de 2021, el foro intermedio revocó parcialmente la determinación del foro primario. A grandes rasgos, el Tribunal de Apelaciones eliminó las partidas relacionadas a los costos adicionales que surgieron del cambio implícito en el material para construir.[31] No obstante, mantuvo aquellas partidas relacionadas con el balance del retenido.[32]

De entrada, el foro intermedio consideró la contención de las aquí recurridas, en cuanto a que el cambio implícito en el contrato no ocurrió. Respecto a esto, resulta provechosa resaltar las expresiones que hizo el foro intermedio. Expuso que

> **[l]a prueba pericial desfilada**, (para cuya estimación estamos colocados en idéntica posición al TPI), **sostiene la determinación del foro primario sobre el cambio de material ordenado por la AEE a TEC**, según

---

[29] Apéndice del *Certiorari*, *Sentencia* del 31 de agosto de 2017, págs. 3505-08.
[30] Apéndice del *Certiorari*, *Solicitud de Apertura y Continuación de Procedimientos*, págs. 3509-511.
[31] Apéndice del *Certiorari*, *Sentencia* del Tribunal de Apelaciones del 26 de enero de 2021, pág. 29.
[32] Íd.

el consejo de CSA. Es decir, vista de forma integral la prueba ante nuestra consideración, juzgamos que, en efecto, a TEC se le hicieron unos requerimientos sobre materiales no contemplados en el diseño contratado.[33]

Ante ello, el foro intermedio concluyó que no existían razones

para que concedamos mayor peso probatorio a la prueba pericial que presentaron los apelantes sobre este asunto, a la que llevó al tribunal a quo a concluir que sí había acontecido el referido cambio en los requerimientos contractuales sobre el material a ser utilizado en los laterales del canal, (al que no hay que denominar cambio implícito, en tanto fue expreso).[34]

No obstante, el Tribunal de Apelaciones estimó que esta determinación no disponía de la controversia ante sí. Al continuar su análisis, el foro intermedio expuso que las aquí recurridas habían planteado que, aun partiendo de la premisa de que hubo un cambio en el material, TEC había tenido aviso temprano para solicitar una orden de cambio y no lo hizo.[35] Adujo que, según las recurridas, TEC conoció que tenía que utilizar el material aludido desde julio de 2004, por lo cual tenía un término contractual de treinta (30) días, es decir hasta agosto de 2004, para presentar su reclamo ante la AEE, lo que no hizo.[36] Añadió que, bajo ese argumento, TEC decidió seguir haciendo pruebas sobre el material y no asistir a las reuniones para discutir los

---

[33] Íd., págs. 21-22. (Énfasis suplido).
[34] Íd., pág. 23.
[35] Íd.
[36] Íd.

asuntos referentes al material exigido, acto que diltató

así su incorporación a la construcción.[37]

Luego de considerar los argumentos de TEC sobre este

particular, en específico, sobre el hecho de que ejecutó

la obra a partir de la instrucción recibida de parte de la

AEE el 2 de junio de 2005, el foro intermedio procedió a

resolver el asunto que entendió permanecía en

controversia. Así, fraseó la interrogante de la siguiente

manera:

> Antes de considerar si, en efecto, TEC pudo haber utilizado el material al que fue instruido por la AEE mucho antes de lo que lo hizo, y, en consecuencia, también presentar su apelación ante la AEE en cuanto conoció del cambio requerido, **nos corresponde verificar si esta cumplió con las obligaciones que le imponía el Artículo 34 del contrato para apelar**, partiendo de las propias fechas establecidas por el TPI en su determinación de hechos.[38]

Al considerar este asunto, el foro intermedio

determinó que TEC opuso una serie de obstáculos para que

se cumpliera con las especificaciones solicitadas por la

AEE y CSA.[39] De esta manera, concluyó que el mecanismo que

surge del Artículo 34 del contrato le hubiese permitido a

TEC plantear los costos adicionales que fuera a incurrir

producto de un requerimiento no previsto en la obra.[40] De

esta manera, habría evitado los costos adicionales

incurridos. Por lo cual, razonaron que TEC no reanudó las

---

[37] Íd.
[38] Íd., pág. 24. (Énfasis suplido).
[39] Íd., pág. 25.
[40] Íd.

labores con el material requerido hasta junio de 2005, pese a conocer del requerimiento desde 2004.[41]

Aun así, el foro intermedio consideró que, tomando como cierto que el momento en el cual TEC estuvo obligada a utilizar el material exigido fuese el 2 de junio de 2005, lo cierto es que no instó su apelación ante el Director Ejecutivo de la AEE hasta el 7 de noviembre de 2005.[42] Es decir, razonó que la apelación fue presentada casi cuatro (4) meses posterior a la notificación a TEC por parte de la AEE sobre la especificación en la granulometría.[43] Por todo lo anterior, el foro intermedio concluyó que la apelación instada ante el Director Ejecutivo de la AEE fue inoportuna. Por consiguiente, determinó que TEC renunció a los remedios procedentes bajo el Artículo 34. Cabe resaltar íntegramente las siguientes expresiones del foro intermedio:

> Merece la pena matizar que al realizar el anterior análisis no ignoramos en punto alguno la deferencia que debemos mostrar por las determinaciones de hechos alcanzadas por el TPI, foro que tuvo ante sí la prueba testifical desfilada y, por ello, contó con una posición inmejorable para asignarle credibilidad. No obstante, respecto a este asunto, por una parte, **se trata de la consideración de prueba documental, que nos coloca en idéntica posición al foro primario para evaluarla**, y por la otra, que, partiendo de las propias determinaciones de hechos del TPI....[44]

---

[41] Íd.
[42] Íd., pág. 26.
[43] Íd.
[44] Íd., págs. 27-28. (Énfasis suplido).

Emitida la decisión del foro intermedio, TEC compareció mediante una *Solicitud de Reconsideración de Sentencia*. De entrada, TEC afirmó que el foro intermedio resolvió una controversia que no había sido traída a su atención pues no fue señalada como error por ninguna de las partes.[45] Además, destacó que el alegado incumplimiento con el Artículo 34 del contrato nunca fue levantado como defensa afirmativa.[46] Es decir, a su entender, el cumplimiento con el Artículo 34 del contrato nunca fue un asunto en controversia en este caso.[47]

Por otra parte, argumentó, que aquí no hubo una controversia apelable hasta el momento en el cual se dio la negativa de la AEE a pagar por el cambio implícito y el tiempo adicional involucrado.[48] Arguyó, que, toda vez que la determinación que denegó el reclamo de costos adicionales no se dio hasta el 7 de octubre de 2005, la comunicación al Director Ejecutivo de la AEE, con fecha del 7 de noviembre de 2005, fue oportuna.[49] Finalmente, expuso que el foro intermedio erró al concluir que el incumplimiento con el Artículo 34, de presumir su ocurrencia, tuvo el efecto de una renuncia a los reclamos

---

[45] Apéndice del *Certiorari*, *Solicitud de Reconsideración de Sentencia*, pág. 75.
[46] Íd.
[47] Íd., pág. 76.
[48] Íd., pág. 79.
[49] Íd.

de TEC.[50] Argumentó que tal efecto no se pactó ni surge de ninguna disposición contractual.[51]

En sentido opuesto, CSA presentó una *Oposición a Moción de Reconsideración*. En su escrito, CSA sostuvo que los argumentos respecto al presunto incumplimiento contractual por TEC fueron levantados en los señalamientos de error que surgen de su *Apelación*.[52] En apoyo, aludió a sus expresiones respecto a la negativa de TEC en implementar un método de construcción temprano en el Proyecto, para restringir el material y así poder construir sobre él.[53] Respecto a esto, esbozó que había alegado que el foro primario erró al no determinar que TEC no mitigó sus daños, lo cual, sostuvo, tuvo el efecto de no reducir la cuantía de daños sufridos.[54] Así, alegó que, en su *Apelación*, planteó que TEC pudo y debió haber instado su reclamación ante la AEE para agosto de 2004.[55] Examinados los escritos de las partes, el Tribunal de Apelaciones declinó reconsiderar su dictamen.[56]

Eventualmente, TEC recurrió ante esta Curia y mediante su escrito le imputó al foro intermedio la comisión de los siguientes errores:

---

[50] Íd., pág. 80.
[51] Íd., pág. 81.
[52] Apéndice del *Certiorari*, *Oposición a Moción de Reconsideración*, pág. 96.
[53] Íd., pág. 97.
[54] Íd.
[55] Íd.
[56] Apéndice del *Certiorari*, *Resolución* del 9 de marzo de 2011, pág. 104.

> Erró el Tribunal de Apelaciones al atender y resolver un asunto que no fue traído ante su atención, ni alegado por ninguna de las partes.
>
> Erró el Tribunal de Apelaciones al no dar deferencia a la apreciación de la prueba del TPI y resolver que la peticionaria no cumplió con el proceso establecido en el Artículo 34 del contrato entre TEC y AEE.
>
> Erró el Tribunal de Apelaciones al conferir un efecto no pactado e improcedente al supuesto incumplimiento con el requisito de notificación contractual del Artículo 34.

Por su parte, CSA presentó una *Oposición a Petición de Certiorari*. Así las cosas, el 28 de mayo de 2021 expedimos el auto.

## II

**A. Función revisora de los tribunales apelativos y el derecho rogado**

Es norma fundamental en nuestro ordenamiento, que, salvo evidencia de pasión, prejuicio, parcialidad o error manifiesto, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad o la formulación de determinaciones de hechos por parte del Tribunal de Primera Instancia.[57] Tal precepto parte de la premisa de que son los foros de instancia quienes se encuentran en la mejor posición para aquilatar la prueba que vieron, oyeron y apreciaron.[58]

---

[57] Véanse, <u>Santiago Ortiz v. Real Legacy Assurance Company, Inc.</u>, 206 DPR 194, 219 (2021); <u>Santiago Montañez v. Fresenius Medical</u>, 195 DPR 476, 490 (2016); <u>Dávila Nieves v. Meléndez Marín</u>, 187 DPR 750, 771 (2013).

[58] <u>Santiago Ortiz v. Real Legacy Assurance Company, Inc.</u>, supra, pág. 219.

De esta manera, la tarea principal de los tribunales apelativos consiste en examinar la aplicación del derecho a los hechos particulares de un caso.[59] Naturalmente, el desempeño de esta función se fundamenta en que el Tribunal de Primera Instancia haya desarrollado un expediente completo que incluya los hechos que haya determinado como ciertos, en base a la prueba que se le presentó.[60] No obstante, si la apreciación de la prueba no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba, su evaluación se distancia de la realidad jurídica, o es inherentemente imposible o increíble, existe la responsabilidad de intervenir.[61]

Por otro lado, surge igualmente de nuestra doctrina, que, cuando se trata del examen de prueba pericial o documental, el tribunal revisor se encuentra en igual posición que el foro recurrido.[62] Así, un foro apelativo está facultado para adoptar su propio criterio respecto a la apreciación y evaluación de la prueba pericial, incluyendo la posibilidad de que pudiese descartarla del todo.[63] Además, hemos resuelto reiteradamente que las conclusiones de derecho de un tribunal recurrido son revisables en su totalidad por tanto el Tribunal de

---

[59] Dávila Nieves v. Meléndez Marín, *supra*, pág. 770.
[60] Íd.
[61] Santiago Ortiz v. Real Legacy Assurance Company, Inc., supra, pág. 219.
[62] González Hernández v. González Hernández, 181 DPR 746, 777 (2011).
[63] Íd.

Apelaciones, como por este Foro.[64] Al ser este un sistema jerarquizado, las interpretaciones de un tribunal superior prevalecen sobre las del tribunal recurrido.[65]

Otro principio bien arraigado en nuestro ordenamiento es aquel que dispone que los tribunales apelativos no pueden considerar controversias que no le hayan sido planteadas, a menos que esto sea **necesario para evitar una injusticia manifiesta**.[66] Es decir, **los tribunales apelativos deben atenerse a resolver solamente aquellos asuntos que le hayan sido planteados en los recursos ante su consideración**.[67] Por todo lo anterior, hemos sido enfáticos al expresar que solamente a través de un señalamiento de error y una discusión fundamentada, con referencia a los hechos y fuentes de derecho en que se sustenta, podrá el foro apelativo atender los reclamos que se le plantean.[68]

No obstante, lo anterior no es óbice para que un tribunal apelativo resuelva una cuestión que no le fue planteada cuando se confronte con un **error patente**.[69] Entiéndase, que un tribunal apelativo se encuentra ante un error patente o manifiesto cuando se convence, **luego de examinar toda la prueba**, de que en efecto se cometió un error, aunque haya evidencia que sostenga las

---

[64] Dávila Nieves v. Meléndez Marín, *supra*, pág. 770.
[65] Íd.
[66] Ortiz v. Holsum, 190 DPR 511, 527 (2014).
[67] Íd.
[68] Íd., pág. 526; Morán v. Martí, 165 DPR 356, 366 (2005).
[69] Vilanova v. Vilanova, 184 DPR 824, 848 (2012).

determinaciones de hechos del tribunal.[70] Así, hemos definido el **error manifiesto** como aquel que se comete **cuando la apreciación de la prueba dista de la realidad fáctica o es inherentemente imposible o increíble**.[71]

Ahora bien, no perdamos de perspectiva que la facultad inherente que tienen los tribunales apelativos para corregir errores patentes debe ser ejercida excepcionalmente.[72] **Si la práctica ordinaria fuera otra, los tribunales apelativos se convertirían en foros consultivos y se prestarían para adjudicar controversias que no le han sido planteadas ni defendidas vigorosamente**.[73]

Después de todo, en nuestra jurisdicción rige el principio general de que **el derecho apelativo**, al igual que el derecho general, **es rogado**.[74] Así, hemos expresado que "nuestro sistema es uno adversativo de derecho rogado que descansa en la premisa de que las partes, cuidando sus derechos e intereses, son los mejores guardianes de la pureza de los procesos, y de que la verdad siempre aflore".[75] Es por esto, que, **salvo la presencia de un planteamiento de naturaleza jurisdiccional, los tribunales *sua sponte* no pueden levantar defensas afirmativas a las**

---

[70] Gómez Márquez v. Periódico El Oriental, Inc., 203 DPR 783, 793 (2020).
[71] Íd.
[72] Vilanova v. Vilanova, *supra*, pág. 848.
[73] Íd.
[74] Ortiz v. Holsum, *supra*, pág. 527. Cestero Aguilar v. Jta. Dir. Condominio, 184 DPR 1, 22 (2011).
[75] Fund. Surfrider y otros v. ARPE, 178 DPR 563, 585 (2010) (citando a SLG v. Secretario de Justicia, 152 DPR 2, 8 (2000)).

**cuales hayan renunciado las partes**.[76] En suma, los tribunales, como organismos, resuelven las disputas que se suscitan entre los ciudadanos y que les sean llevadas ante su consideración, sin que les sea dable intervenir *motu proprio* en tales disputas.[77]

### III

Las controversias que surgían de este recurso eran susceptibles de ser examinadas en dos (2) fases. En primer lugar, encontramos la interrogante sobre si el Tribunal de Apelaciones, al examinar el pleito de epígrafe, se extralimitó en el ejercicio de sus funciones revisoras. En segundo lugar, de entender que el foro recurrido no erró en el ejercicio de sus facultades jurisdiccionales, debíamos decidir si sus conclusiones de derecho fueron correctas.

Es decir, primeramente, nos era necesario auscultar si el foro intermedio erró al presuntamente adjudicar un asunto que no le fue planteado, al interferir así con la apreciación de la prueba por parte del foro primario. A *grosso modo*, esto es lo planteó la peticionaria en su primer y segundo señalamiento de error. Ahora bien, en segundo lugar, en la medida que concluyéramos que el foro intermedio no cometió estos errores, solo faltaría pasar

---

[76] Álamo v. Supermercado Grande, Inc., 158 DPR 93 (2002) nota 10.
[77] Ortiz v. Holsum, *supra*, pág. 528 (citando a R. Elfren Bernier y J. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Publicaciones JTS, 1987, pág. 3).

juicio sobre su conclusión respecto al alegado incumplimiento de la peticionaria con el Artículo 34 de su contrato con la AEE.

Al escudriñar la *Sentencia* del Tribunal de Apelaciones, noto que ese foro, de entrada, consideró la procedencia del cambio implícito en los términos del contrato entre TEC y la AEE. Bajo este análisis, examinó la prueba pericial que el foro primario tuvo ante sí y arribó a la conclusión de que, en efecto, en este Proyecto sí hubo un cambio en las especificaciones. Es decir, aún bajo el estándar más relajado que los foros apelativos pueden emplear respecto a la prueba pericial, el Tribunal de Apelaciones entendió que la prueba desfilada era suficiente para sostener la determinación del foro primario. De esta manera, el foro intermedio estimó que las partidas de daños que el Tribunal de Primera Instancia concedió encontraban apoyo en la prueba presentada por TEC. Hasta ese punto, el Tribunal *a quo* permaneció en armonía con la visión de los hechos que adoptó el foro de instancia.

No obstante, a renglón seguido, el Tribunal de Apelaciones explicó que su determinación respecto a la procedencia del cambio implícito no disponía, por sí sola, de la controversia entre las partes. **Es aquí donde ——por primera vez en el transcurso de este pleito—— alguien hace alusión a un presunto incumplimiento con el Artículo 34**

**del contrato entre TEC y la AEE.** En sus propias palabras, el foro intermedio anunció que les restaba una interrogante por contestar previo a disponer del caso. En particular, entendió que le correspondía "verificar si esta [TEC] cumplió con las obligaciones que le imponía el Artículo 34 del contrato para apelar, partiendo de las propias fechas establecidas por el TPI en su determinación de hechos".[78] Así, el foro intermedio, en palabras que no admiten otra acepción, informó la controversia que, a su juicio, le restaba por dilucidar.

**De haber sido este un asunto que hubiese sido argumentado ante el Tribunal de Apelaciones, por cualquiera de las partes, el recurso que se presentó ante este Tribunal no existiría en su presente forma. No obstante, ese no fue el caso**. Un examen detenido de los alegatos que la AEE y CSA presentaron ante el foro intermedio demuestra inequívocamente los argumentos con los cuales pretendían obtener la revocación del dictamen del foro primario.

Por su parte, la AEE tomó excepción respecto a la conclusión del foro primario de que esta le adeudaba a TEC una partida por concepto del retenido. Por otro lado, el resto de sus señalamientos de error iban dirigidos a contrarrestar la determinación de que en este Proyecto hubo un cambio implícito en las especificaciones de

---

[78] Apéndice del Certiorari, *Sentencia* del Tribunal de Apelaciones del 26 de enero de 2021, pág. 24.

construcción y, por ende, en el contrato. Además, la AEE pretendía también que el foro intermedio concluyera que CSA, en cualquier caso, era la entidad responsable de responderle a TEC, en la eventualidad que validase el cambio implícito. Nada en estos argumentos apunta a un incumplimiento del Artículo 34 del contrato de las partes. No obstante, esto no derrota del todo las actuaciones del foro intermedio, pues ante ese tribunal había otro litigante que igualmente pretendía impugnar la decisión del foro primario: CSA.

Es respecto a esta parte donde el Tribunal de Apelaciones adujo encontrar los fundamentos para dirimir el asunto respecto al incumplimiento con la cláusula de resolución de disputas del contrato. Según pareció entender el foro intermedio, los argumentos de CSA, respecto a una alegada falta de mitigación de daños por parte de TEC, traen consigo el planteamiento sobre el Artículo 34. **Este no fue el caso.**

Una mirada al alegato de CSA demuestra que esta levantó ciertos planteamientos, sobre la alegada falta de mitigación de daños, al sostener que TEC tuvo conocimiento anticipado del material que la AEE pretendía usar en la reconstrucción de las paredes laterales del canal. Así, CSA destacó que TEC tuvo conocimiento de este requerimiento desde el año 2004 y que, durante el proceso subsiguiente, tuvo oportunidad para considerar los costos

y tiempo que el uso del material ordenado implicaría. Por esto, invocó la doctrina de mitigación de daños como fundamento para reducir o derrotar la reclamación contractual de TEC, al presumir que el foro intermedio concluyera que el cambio implícito en efecto ocurrió.[79]

Ahora bien, el detalle es que el Tribunal de Apelaciones no esboza argumentos que sugieran que, en efecto, concluyó que en este caso hubo una ausencia de mitigación de daños. De haber procedido de esa manera tampoco habría controversia que resolver respecto a las actuaciones del foro intermedio. **Es decir, si el Tribunal de Apelaciones hubiera revocado el dictamen del foro primario, por entender que en efecto TEC debió haber mitigado sus daños, no se habría excedido en sus facultades**. Más bien, habría adjudicado un asunto que le fue planteado oportunamente y por los medios adecuados, por una de las partes. **Nuevamente, esto no ocurrió.**

Ciertamente, el foro revisor, al examinar el legajo apelativo, encontró un asunto, que, a su juicio, no fue adjudicado correctamente por el foro sentenciador. El problema con esto es que se trata de un asunto que no fue controvertido ante el Tribunal de Primera Instancia. Un examen del extenso expediente de este caso demuestra que **la AEE y CSA nunca levantaron el alegado incumplimiento**

_____

[79] Apéndice del *Certiorari*, *Recurso de Apelación presentado por la parte apelante, CSA Architects & Engineers el 28 de marzo de 2016 ante el Tribunal de Apelaciones*, págs. 341-49.

**del Artículo 34 ante el foro primario**. Habida cuenta de la evidente importancia que las recurridas le parecen adscribir a un incumplimiento de esta disposición, me resulta extraño que estas nunca expusieron tan fundamental planteamiento ante el Tribunal de Primera Instancia. En cualquier caso, **no es la función de los tribunales escoger mejores argumentos que los que las propias partes adujeron**.

Es aquí donde resulta pertinente revisitar el proceso que el foro intermedio utilizó para arribar a esta conclusión. Según adujo el tribunal recurrido, este no tenía escollo alguno para encontrar el defecto, pues estaban ante la presencia de un asunto que provenía de la prueba documental. Reiteraron, que por ser esta evidencia documental se encontraban en la misma posición que el foro primario. Naturalmente, no hay nada erróneo en esta aseveración, pero su aplicación en este caso no se ajusta a la realidad que surge del expediente. Adviértase, que aquí no era posible que el Tribunal de Apelaciones pudiese ampararse en la evidencia que surge de la prueba documental, pues la única evidencia documental que tuvo ante sí fue el contrato entre las partes.

Lo anterior pone en entredicho la corrección del curso de acción que prosiguió el foro intermedio, pues surge que el tribunal *a quo* nunca tuvo ante sí la totalidad de la prueba documental. Es más, ni siquiera

tuvo una cantidad sustancial de ella, pues rehusó acoger la petición de la AEE para que se elevaran los autos originales. A tal efecto, solamente pidió que se le proveyera el contrato entre las partes. Al así proceder, el foro intermedio evidente incurrió en un ejercicio de interferencia con la apreciación de la prueba, sin contar con los elementos de juicio para ello.

Bajo la normativa antes esbozada, **era necesario que el Tribunal de Apelaciones encontrara en el expediente un erro patente**, el cual, de no corregirse, provocara una injusticia manifiesta. **No surge tal error en este caso**. Reitero mi criterio de que el foro intermedio erró al interferir con un dictamen judicial en ausencia de los elementos que nuestro ordenamiento exige para tal actuación. Ante un caso litigado por espacio de más de diez (10) años, correspondía a las partes con interés traer los planteamientos jurídicos, no jurisdiccionales, que pudiesen influir en la decisión final del pleito.


                              Edgardo Rivera García
                              Juez Asociado